DOLORES GONZÁLEZ, demandante y apelada, *v.* WHITE STAR BUS LINE, INC. y JOSÉ FRANCISCO SALIB, demandados y apelante la primera.

Núm. 7195.—*Sometido:* Marzo 25, 1938. *Resuelto:* Julio 28, 1938.

*Celestino Iriarte, F. Fernández Cuyar y H. González Blanes,* abogados de la apelante; *Dubón & Ochoteco,* abogados de la apelada.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Dolores González demandó a la White Star Bus Line, Inc., una corporación de servicio público dedicada al transporte de pasajeros y a José Francisco Salib, mayor de edad y vecino de San Juan, reclamándoles mil quinientos dólares por los daños y perjuicios que sufriera a consecuencia de un accidente ocurrido en la siguiente forma:

El doce de junio de 1934, a las 12:20 p.m., la demandante viajaba como pasajera mediante paga en una guagua de la White Star por la Avenida Ponce de León. Cerca de la parada diez, la guagua, que iba guiada por un chófer de la empresa, chocó con el automóvil del demandado Salib que él mismo conducía.

El choque según la demandante se debió a la culpa, negligencia o impericia de ambos conductores y le produjo la fractura de la sexta vértebra cervical, una grave contusión en el pecho, otras en diferentes partes del cuerpo y depresión nerviosa, daños que fija en la cantidad reclamada agregando a las lesiones los dolores físicos, la angustia mental y los sufrimientos morales.

Pidió la White Star Bus Line mayor especificación y la demandante se allanó, proporcionándola, en resumen, como sigue:

"La culpa, negligencia, impericia y descuido del chófer Aniceto Salamán de la demandada White Star Bus Line, Inc.".... consistió ...."en detener....violenta y súbitamente la marcha de la referida guagua....en un sitio distante del señalado como parada oficial de dicha guagua....sin advertir de ello a los pasajeros....no haber sacado la mano, ni hecho ninguna otra señal, ...."

Contestó la codemandada White Star admitiendo los dos primeros hechos de la demanda y negando que su guagua chocara con el automóvil del codemandado Salib, que el choque tuviera lugar por culpa, negligencia o impericia de su chófer, que la demandante sufriera las lesiones que enumera y que tuviera necesidad de hospitalizarse y hubiera sido perjudicada en mil quinientos dólares ni en suma otra alguna.

Como defensas especiales alegó que si algo sufrió la demandante que le ocasionara perjuicios, ello se debió exclusivamente a la negligencia única del codemandado Salib, quien en la fecha y sitio indicados manejaba su automóvil con absoluto descuido y sin fijarse en los vehículos que le precedían, yendo a chocar con la guagua al ésta pararse a instancia de un pasajero; que en el accidente no medió por su parte culpa o negligencia, pues su chófer conducía la guagua a poca velocidad, por su derecha y la detuvo al ser requerido por un pasajero en forma moderada y haciendo la señal correspondiente, y que la demanda no aduce hechos suficientes determinantes de causa de acción.

Fué el pleito a juicio. Comparecieron la demandante y los demandados por sus abogados y presentaron su evidencia, que fué pesada por la corte como sigue:

"Apreciando toda la prueba en su conjunto, llegamos a la conclusión, firme, categórica y absoluta de que ambos demandados contribuyeron a la realización del accidente y ambos son responsables de los daños sufridos por la demandante.... la demandante fué

hospitalizada en la Clínica Santurce, y allí fué asistida por el Dr. Reyes. Éste declaró que no tenía signo alguno de trauma, ni presentaba lesión alguna, pero que no obstante se quejaba de dolores en el cuello y en el pecho. Se le tomó una radiografía y la misma demostró que no había fractura. Cinco días después fué dada de alta. Pasó entonces la demandante a su casa, y allí fué asistida por el Dr. Rafael Maldonado, quien 'sospechó una posible fractura de la vértebra'; se quejaba de dolores en el pecho, en la cabeza y tuvo esputos con sangre. Por último el Dr. Ruiz Cestero, que examinó tanto las radiografías tomadas en la Clínica Santurce como las tomadas en la Clínica Miramar, y que admitimos como evidencia, nos declaró que en dichas radiografías no se apreciaba signo alguno radiográfico de fractura, pero sí apreció una lesión ósea entre la sexta y séptima vértebra cervical, que a su juicio era debida a una artritis hipertrófica de bastante duración, enfermedad que es de carácter infeccioso, pero que no fué ocasionada por trauma alguno. .... El hecho de que una persona padezca de una enfermedad no puede servir de excusa alguna para negarle la indemnización a que tiene derecho, pues si como en este caso la demandante padecía de artritismo, cosa que no revela la prueba, (pero que la sentamos como hipótesis para nuestro razonamiento,) y la conmoción producida por el choque aceleró, agudizó o provocó un ataque artrítico determinante de daños y sufrimientos, los mismos, por ser imputables a los demandados, dan derecho a indemnización. Véase esta doctrina en el caso de *Muñoz* v. *Escudero,* 42 D.P.R. 540. Resolvemos que no hubo fractura, pero sí que hubo dolores físicos, angustias mentales y sufrimientos morales que deben ser indemnizados. La declaración del médico en cuanto a que tuvo esputos sanguinolentos, no ha sido contradicha. Para que tales esputos se produzcan, no es necesario un fuerte trauma o fractura de las costillas, o lesiones de los pulmones.''

Dicha evidencia así pesada fué larga, repetida, innecesaria y confusa en gran parte. La hemos estudiado toda. De ella entresacaremos porciones salientes de algunas declaraciones que a nuestro juicio ponen de relieve la substancia del caso. Declaró la demandante:

''Cuando la guagua pasó el Puente del Agua para llegar a la Parada 10...dió un jamaqueón...se estremeció...se paró y entonces hubo un choque y yo me agolpeé...con el asiento del frente y el mismo que yo iba... Me condujeron a la Clínica Santurce...me

atendieron varios médicos...y a los cinco días tuve que abandonar la clínica...recibí lesiones en el pecho y en el cerebro... La guagua paró antes del choque...inesperadamente...después del Puente del Agua y antes de la parada oficial...cuando la sacaron de la clínica lo fué en una camilla, sintiendo escalofríos, dolor de cabeza, mareos constantes, pérdida del conocimiento, esputos sanguinolentos, hinchazón...en la parte del cuello, y la parte del pecho muy adolorida... El dolor del cuello cesó un poco a los cinco meses, pero me siguió siempre, me mareaba siempre a veces, perdía el conocimiento de momento, y cuando traté de ir a mi trabajo tuve que faltar muchas veces,..."

Aniceto Salamán, el chófer, manifestó que:

"Pasando el puente oí que un pasajero me dijo 'Aguanta, que se cayó un paquete.' Yo pegué a la derecha y paré la guagua. Cuando estoy levantándome del asiento para ir a buscar el paquete, un carro ...el choque. Cuando el choque, yo no bajé a buscar el paquete, porque todo el mundo se alarmó..." Conoce a la demandante. "...era pasajera de la guagua...la vi cuando se bajaron todos los pasajeros... no la condujo a ningún sitio...a ninguna clínica... ella fué la que dijo que estaba enferma y que estaba mala...que ella se sentía agolpeada..." Luego admite que "la llevó a la Clínica Santurce...por exigencias de ella, que ella dijo que estaba mala... que se sentía mal, que la llevara a la clínica."

Preguntado: "¿Cuando usted metió los frenos y miró a través de ese espejo, usted vió el carro con el cual chocó el vehículo suyo?" contestó: "No...porque esa guagua llevaba como cinco o seis pasajeros parados a esa hora y no podía ver ningún carro que viniera detrás; por lejos que viniera no se podía ver porque el pasaje viene detrás."

Preguntado si dió aviso al parar, contestó: "...es difícil sacar la mano, porque si usted saca la mano, se ve nada más que los dedos. . . La señal de parada que dí fué la de 'stop' que tiene la guagua. . . . Es un farol que tiene la guagua detrás, que tiene un vidrio rojo y en medio de ese vidrio tiene la palabra 'stop'."

El codemandado Salib dijo:

"Yo iba de aquí para Santurce, como al pasar del Puente del Agua, pues la guagua que iba delante de mí, se paró violentamente

y yo traté de pasar, pero como venía tráfico de Santurce no pude pasar y traté de defenderme del choque pero siempre choqué con la guagua.''

Francisco Alazón, policía insular que no presenció el accidente pero que acudió en seguida a practicar la investigación, declaró que Salamán le dijo que ''se le había caído un paquete y que, al parar, le habían chocado por detrás.'' Y que Salib le manifestó ''que la guagua paró y que él iba cerca, que había chocado la guagua, y que no tuvo tiempo de echarse a la izquierda....que la guagua había parado a su derecha.''

Declaró además que la demandante bajó por sí misma de la guagua y le manifestó que se había dado un golpe en el pecho y la condujo a la clínica el mismo chófer.''

El Doctor Rafael Maldonado manifestó que ''el padre de la niña la llevó a la Sala de Socorros del Barrio Obrero... para que yo se la viera y le recetara, pero al ver que era menester tomar una radiografía para determinar lo que tenía,...la envié al Hospital Municipal...''

Tomada la radiografía, la vió con ''el Dr. Sierra, el Dr. Díaz García y el Dr. Comas....nosotros opinamos, con arreglo a la radiografía, que demostraba una fractura. . . .'' No pudo seguir declarando porque la parte contraria se opuso y la corte mantuvo su oposición. A otras preguntas contestó que había indicado ''a la paciente que se quedara en cama todo el tiempo, sin movimiento alguno....porque creí que era el tratamiento adecuado...para una fractura.''

Visitó a la enferma bastante tiempo. Le reconoció el pecho y lo encontró aparentemente normal. La primera vez que la examinó notó que al toser hubo un esputo con ciertas partículas de sangre.

El Dr. Antonio R. Reyes de la Clínica Santurce, declaró que la demandante ingresó en la clínica a las doce y veinte y cinco del 12 de junio de 1934 y salió el 16. No dice el récord quién la llevó. La trató por encargo de la White

Star Bus Line. "El examen hecho revela una joven pobremente desarrollada, no hay signo reciente de traumatismo, pero alega que recibió un trauma (esto lo apuntaron en inglés) cuando llegó. . . . Se le hicieron radiografías. No aparecía ninguna descoloración en la piel ni en ningún sitio que demostrara un traumatismo. Ella se quejaba de dolor . . . . se le dió aspirina para el dolor; bolsas de hielo al cuello, y como no había indicación de nada más, pues no se le hizo nada más."

Se retiró de la clínica "porque estando en condiciones de darse de alta, la dimos de alta, precisamente porque no encontrábamos que tuviese nada que ameritara el estar recluída."

Al retirarse ella "dijo que había esputos, un poco de sangre. . . . Que le dolía el pecho. . . . que le dolía el cuello."

Preguntado "¿Y por qué entonces permitió que esta paciente saliera del hospital?" contestó "Porque no tenía ninguna lesión que demostrara que tuviese patología."

Félix Robles, testigo de la White Star dijo que viajaba en la guagua, que "en el Puente del Agua, íbamos para Santurce y el chófer paró la guagua, y como al poco ratito de estar la guagua parada, pues un carro que venía chocó por la parte de atrás. . ." La guagua "iba llena, porque era un día, a las doce y pico, doce y media cuando uno sale de la oficina." No se fijó si algún pasajero se fué hacia adelante. Él no se fué.

El Dr. Ruiz Cestero, médico cirujano, examinando dos radiografías introducidas y admitidas sin oposición en evidencia, manifestó refiriéndose a la primera que no podía decir si existía o no fractura y a la segunda "de esta radiografía se desprende que no hay fractura en esta posición, porque existe una lesión en la sexta vértebra cervical. . . . Los signos radiográficos que presenta esta placa son los que llamamos nosotros una artritis hipertrófica de bastante duración. . . . Que es vieja, claro. . . . Las artritis son generalmente debidas a procesos infecciosos."

Señálanse en el alegato de la apelante, The White Star Bus Line, siete errores.

Los dos primeros se refieren a la apreciación de la prueba, el tercero a la aplicación de la regla de que cuando el daño es el resultado de la negligencia combinada de varias personas son éstas responsables solidaria y mancomunadamente, el cuarto al declarar con lugar la demanda basándose en actos de negligencia no alegados, el quinto y el sexto al fijar la cuantía de los daños y perjuicios sobre bases erróneas y el séptimo al imponerle las costas, desembolsos y honorarios de abogado.

Todos los señalamientos se argumentan ampliamente con lujo de citas de autoridades y se impugnan de igual modo por la demandante. El demandado Salib no ha tenido intervención en el recurso.

A nuestro juicio la sentencia apelada encuentra base en lo alegado y probado. La negligencia de la demandada al parar en el sitio, en la forma y en el tiempo en que lo hizo, es evidente. Es muy posible que si Salib, el otro demandado, hubiera sido un chófer experto y se hubiera dado cuenta desde el primer instante de lo que la guagua intentaba, hubiera podido evitar el choque, desviando rápidamente su automóvil, pero ello no exonera de responsabilidad a la White Star dueña de la guagua, porteadora pública a cuya pericia se confió mediante paga la demandante. Los casos de *Cruz et al.* v. *Frau,* 31 D.P.R. 93 y *Cubano* v. *Jiménez et al.,* 32 D.P.R. 167 aplicados por la corte, lo fueron, pues, propiamente. A la negligencia conjunta de ambos demandados, se debió el choque, y ambos deben, de acuerdo con la ley y la jurisprudencia, responder.

En cuanto a los daños realmente sufridos, no es en verdad claro el caso. Contradictoria es la evidencia y la que favorece a la demandante no llega a demostrar todo lo alegado en la demanda. La existencia de una fractura como consecuencia del choque, es muy dudosa. La propia corte

sentenciadora la eliminó como una realidad. Pero queda el golpe, el esputo de sangre, los dolores, todo menos grave pero comprendido dentro de lo alegado en la demanda. La suma de seiscientos dólares fijada por la corte como compensación no es de tal modo excesiva que se imponga una modificación de la misma, sobre todo resolviendo como resolveremos que el último de los señalamientos de error está bien fundado.

Nos referimos a la imposición de las costas incluyendo honorarios. Las costas, como tales, deben subsistir, pero no, atendidas todas las circunstancias que concurren, los honorarios. Creemos que no fué temeraria la demandada apelante al defenderse.

*En tal virtud debe modificarse la sentencia apelada en el sentido de condenar a los demandados al pago de las costas pero sin comprender en ellas los honorarios de abogado, y confirmarse así modificada.*

El Juez Asociado Señor De Jesús no intervino.