Roberto Cole et al., demandantes, apelantes y apelados, *v.*
The Escambrón Development Company, Inc., deman-
dada, apelada y apelante, y Francisco Quiñones y
United States Casualty Company, demandados y ape-
lados. Juan Mercado et al., demandantes, apelantes y
apelados, *v.* La Misma, demandada, apelada y apelante,
y Los Mismos, demandados y apelados. Luis Albelo et
al., demandantes, apelados y apelantes, *v.* La Misma,
demandada, apelante y apelada, y Los Mismos, deman-
dados y apelados. Alfonso González Carbo et al.,
demandantes, apelantes y apelados, *v.* La Misma, deman-
dada, apelada y apelante, y Los Mismos, demandados y
apelados. Robert Denton y Carmen H. Denton, de-
mandantes y apelados, *v.* Francisco Quiñones, United
States Casualty Company y The Escambrón Develop-
ment Company, Inc., demandados y apelante la última.
Angelina Rivera Álvarez et al., demandantes y ape-
lados, *v.* The Escambrón Beach Club, Francisco
Quiñones, Félix Benítez Rexach, United States
Casualty Company y The Escambrón Development
Company, Inc., demandados y apelante la última.

Núms. 10227, 10246–47. *Sometidos:* Diciembre 13, 1950  *Resueltos:*
Mayo 31, 1952.

522

E. *Martínez Rivera,* abogado de los demandantes; *Francis e Ydrach,* abogados de la demanda The Escambrón Development Co., Inc.; *Emilio de Aldrey,* abogado de los codemandados Francisco Quiñones y United States Casualty Co.

El Juez Asociado Señor Negrón Fernández emitió la opinión del tribunal.

Los presentes recursos envuelven seis pleitos incoados por varios demandantes contra Francisco Quiñones y su aseguradora, United States Casualty Company, y The Escambrón Development Company, Inc. Los hechos que dieron origen a estos pleitos pueden sintetizarse así:

El 23 de febrero de 1947 se celebraba un baile de niños en el sitio de recreo conocido por Escambrón Beach Club, en San Juan. Alrededor de las 5 de la tarde, en el transcurso de la fiesta, se desplomó parte del piso del salón de baile, que lo constituía un terraplén o plataforma de concreto sostenida por zocos o viguetas de hormigón. En ese momento fueron lanzadas, y cayeron al agua, varias de las personas que participaban de la fiesta y que habían sido admitidas mediante el pago y entrega de los boletos correspondientes, sufriendo lesiones físicas y perdiendo objetos personales.

Para la fecha en que ocurrieron estos hechos el demandado Francisco Quiñones era subarrendatario(¹) de The Escambrón Development Company, Inc., en cuanto a los edificios y facilidades recreativas del Escambrón Beach Club, explotando como negocio dichas facilidades recreativas. The Escambrón Development Company, Inc., era la dueña de tales edificios y facilidades, siendo a su vez arrendataria(²) de El Pueblo de Puerto Rico en cuanto a los terrenos en que dichas estructuras ubicaban. La United States Casualty Company, aseguradora de Francisco Quiñones tenía, para la fecha de referencia, cubierta la responsabilidad por daños en que éste

---

(¹) El contrato de subarrendamiento—de fecha 14 de octubre de 1946—fijó para el mismo, por su Cláusula número dos, un período de cuatro años a contarse desde el día 15 de octubre de 1946, prorrogable a opción del subarrendatario por dos años más previa notificación al subarrendador, por escrito, con tres meses de antelación.

(²) El contrato original de arrendamiento de los terrenos fué celebrado entre El Pueblo de Puerto Rico y Félix Benítez Rexach con fecha 15 de diciembre de 1931, habiendo adquirido The Escambrón Development Company, Inc., dicho derecho mediante cesión que le hiciera el arrendatario original el 17 de febrero de 1940.

pudiera incurrir con motivo de lesiones o muertes ocasionadas por accidentes a terceras personas en su negocio.

En las demandas se imputó negligencia común y o separada a los demandados Francisco Quiñones, como arrendatario y dueño del mencionado negocio, y a The Escambrón Development Company, Inc., como arrendadora y dueña de los edificios, consistente dicha negligencia en mantener abierto al público y permitir a éste el uso del salón de baile del Escambrón Beach Club, a pesar de que las columnas y vigas que servían de soporte a la plataforma del piso eran batidas y lavadas continuamente por las corrientes del agua del mar, sin que tomaran conjunta o separadamente aquellas precauciones y medidas de sana prudencia necesarias para garantizar la seguridad del público, y sin que observaran la diligencia y el cuidado que la naturaleza de la estructura requería para mantenerla en un buen estado de uso y evitar que su condición se tornara peligrosa e insegura.

Tanto Quiñones y su aseguradora United States Casualty Company, como The Escambrón Development Company, Inc., negaron responsabilidad alguna por el accidente al contestar separadamente las demandas en cada una de las acciones entabladas.

La posición asumida por Quiñones y su aseguradora, en cuanto a la negligencia imputádale a Quiñones, fué, en esencia, la de que el derrumbe de la plataforma del salón de baile ocurrió sin culpa alguna de parte de Quiñones, por razones y motivos enteramente ajenos y desconocidos por él, sin que dicha plataforma denotara en forma alguna a la vista que existiera un defecto en su construcción, habiendo creído él siempre que la misma había sido construída por la subarrendadora "en forma vigorosa y resistente teniendo en cuenta el sitio donde había sido construída"; que en la fecha del accidente el salón de baile se dedicaba "al uso usual y corriente [a] que era destinado tanto por él en su calidad de arrendatario como por sus arrendadores que administra-

ban anteriormente dicho local"; que de haber existido defectos de construcción en la referida plataforma "éstos eran de tal naturaleza ocultos que bajo ningún concepto podían ser apreciados por el codemandado Francisco Quiñones" y que, en consecuencia, si hubo negligencia o descuido con respecto a la construcción o mantenimiento de dicha plataforma, dicha negligencia o descuido existió de parte de la arrendadora.

La posición asumida por The Escambrón Development Company, Inc., en cuanto al mismo extremo, fué, en esencia, la de que el accidente no se debió en forma alguna a negligencia de su parte, ya que dicha corporación "nunca estuvo en posesión material de los edificios que integraban el Escambrón Beach Club ni conocía en forma alguna su estado o sus defectos si algunos, ni explotó nunca como empresario dichos edificios ni ninguno de ellos"; que desde el 18 de junio de 1936 hasta el 30 de junio de 1946 dichos edificios estuvieron en la posesión material de don Miguel Vidal y de una corporación denominada The Escambrón Beach Club, Inc.; que después del 30 de junio de 1946 The Escambrón Development Company, Inc., instituyó acción de desahucio contra The Escambrón Beach Club, Inc.; dicho pleito fué transigido, entregando The Escambrón Beach Club, Inc., directamente la posesión material de los edificios a Francisco Quiñones, con quien The Escambrón Development Company, Inc., suscribió un contrato de subarrendamiento el 14 de octubre de 1946; que a fin de asegurar la inspección procedente y las reparaciones necesarias para que el edificio principal del Escambrón Beach Club estuviera en buen estado para servir al uso para el cual fué destinado, se insertó expresamente en el referido contrato de subarrendamiento la Cláusula dieciocho, la cual copiada a la letra dice:

"DIECIOCHO: Se conviene y se estipula que la parte subarrendataria se obliga a mantener los bienes subarrendados en buen estado de reparación y de conservación y a cuidar de ellos con la diligencia de un buen padre de familia. Se aclara y se

entiende que al recibir la entrega de los bienes aquí subarrendados la parte subarrendataria procederá a poner el edificio principal descrito en el párrafo PRIMERO de este contrato bajo la letra (e) en buen estado de reparación, entendiéndose y estipulándose que el costo de tal reparación será por cuenta de la parte subarrendataria hasta CUATRO MIL DÓLARES ($4,000), entendiéndose y aclarándose que cualquier suma o sumas que sean necesarias para tal fin en exceso de CUATRO MIL DÓLARES ($4,000) serán pagadas por la parte subarrendadora, y entendiéndose además que luego de efectuadas tales reparaciones, las cuales se efectuarán por la subarrendataria dentro de un período de sesenta días, la reparación y conservación de dicho edificio será por cuenta del subarrendatario tal y como se ha convenido. Se aclara que en cuanto a las demás cosas subarrendadas, incluyendo los demás edificios, la parte subarrendataria conoce el estado y condición en que se encuentran en esta fecha, los acepta tal y como están, y se obliga a repararlos y así reparados a mantenerlos en buen estado de conservación y a cuidar de ellos con la diligencia de un buen padre de familia."

Trabada en esa forma la contienda(3) se celebró un juicio en el tribunal inferior, en el cual tres de los casos se vieron conjuntamente. Los demás se sometieron, en cuanto a la cuestión de negligencia, por la prueba aportada en dicho juicio, practicándose, sin embargo, en cada uno de ellos, prueba en cuanto a los daños.

El tribunal inferior declaró con lugar todas y cada una de las demandas contra The Escambrón Development Company, Inc., concediendo a los varios demandantes en cada una de ellas distintas sumas en concepto de daños y perjuicios por lesiones físicas, sufrimientos mentales y pérdida de objetos personales. Declaró sin lugar todas y cada una de las demandas en cuanto a Francisco Quiñones y su aseguradora United States Casualty Company.

Al anterior resultado llegó el tribunal inferior luego de

---

(3) Es innecesario hacer mención de la posición asumida por los co-demandados en cuanto al accidente en sí y a los daños sufridos, ya que los presentes recursos se circunscriben a la cuestión de responsabilidad por negligencia, la cual, como hemos visto, negaron tanto Quiñones como The Escambrón Development Company, Inc.

considerar que la Cláusula dieciocho del contrato de subarrendamiento, anteriormente transcrita, debía interpretarse "por su contexto y por las circunstancias que precedieron a su otorgamiento en el sentido de que imponía al [sub] arrendatario la realización y pago de las reparaciones necesarias para el embellecimiento del salón de baile arrendado, tales como pintura, decorado, arreglo de ventanas, puertas y de la marquesina"; y que en la suma de $4,000 consignada en dicha cláusula para tal propósito "no se incluía o contemplaba por las partes la reconstrucción de parte del edificio o reparación de su base y viguetas de hormigón", por lo cual correspondía a The Escambrón Development Company, Inc., la reconstrucción o reparación de dicha base y viguetas de hormigón. Llegó a la conclusión también el tribunal inferior que los pilotes y vigas de la plataforma que se desplomó el día del accidente se encontraban en avanzado estado de deterioro y que dicha condición "databa desde una fecha cuatro años anterior al otorgamiento del contrato de [sub] arrendamiento," y que "Quiñones ignoraba el estado de deterioro de estas vigas y tampoco hubiera podido determinarlo mediante una inspección ordinaria y razonable."

La codemandada The Escambrón Development Company, Inc., interpuso recurso de apelación contra todas y cada una de las seis sentencias dictadas en su contra. Contra cuatro de esas sentencias interpusieron también recurso de apelación los demandantes, en tanto las mismas declararon sin lugar las demandas contra Francisco Quiñones y la compañía aseguradora. (⁴)

La codemandada The Escambrón Development Company, Inc., como apelante, imputa al tribunal inferior, en su alegato ante este Tribunal—común para todos los recursos—

(⁴) En dos de los pleitos los demandantes no apelaron. Los recursos de apelación que se siguen ante este Tribunal bajo los números 10,246 y 10,247, fueron interpuestos en dichos pleitos por la codemandada The Escambrón Development Company, Inc.

la comisión de seis errores: (1) concluir que correspondía a dicha demandada la reconstrucción de la base del edificio o la reparación de dicha base y viguetas de hormigón; (2) concluir que Francisco Quiñones ignoraba el estado de las vigas que se desplomaron y que no hubiera podido determinarlo mediante una inspección ordinaria y razonable; (3) concluir que bajo la Cláusula dieciocho del contrato de subarrendamiento Quiñones venía obligado solamente a realizar las reparaciones necesarias para el embellecimiento del salón de baile, tales como pintura, decorado, arreglo de ventanas, de las puertas y de la marquesina, y que la suma de $4,000 mencionada en dicha cláusula había sido asignada para dicho propósito sin que incluyera la reconstrucción del edificio o reparación de su base y viguetas de hormigón; (4) permitir que el abogado Rafael Rivera Zayas declarara sobre conversaciones habidas en derredor de la redacción del contrato de subarrendamiento; (5) concluir que la Cláusula dieciocho del referido contrato debe interpretarse por su contexto y por las circunstancias y discusiones que precedieron a su otorgamiento; y (6) declarar con lugar las demandas contra dicha demandada The Escambrón Development Company, Inc., ya que la única parte responsable a los demandantes lo es el subarrendatario Francisco Quiñones.

Por su parte, los demandantes que apelaron en cuatro de los seis pleitos incoados, imputan al tribunal inferior la comisión de los siguientes errores: (1) resolver que el demandado Francisco Quiñones no tenía conocimiento del mal estado del piso; (2) resolver que mediante una inspección ordinaria, Francisco Quiñones no hubiera podido descubrir el mal estado del piso; (3) exonerar de responsabilidad a Francisco Quiñones y su aseguradora United States Casualty Company.

De otro lado, el codemandado apelado Francisco Quiñones sostiene, en síntesis, que la responsabilidad es totalmente de The Escambrón Development Company, Inc., o sea la sub-

arrendadora, ya que la condición de deterioro de las vigas y pilotes que servían de soporte a la plataforma que se derrumbó, existía desde mucho antes de la fecha en que le fué entregado el edificio del salón de baile en virtud del contrato de subarrendamiento; que al asumir él, Quiñones, como subarrendatario, la obligación de hacer reparaciones en el referido edificio, lo hizo en forma limitada, sin que tales reparaciones incluyeran la reconstrucción de la plataforma o sus cimientos, y además porque Quiñones ignoraba el estado de las vigas que servían de soporte a dicha plataforma, sin que hubiera podido determinar que tal era el estado mediante una inspección ordinaria y razonable.

A fin de reducir la contienda jurídica ante nos a sus debidas proporciones, consideraremos, en primer término, y sin ajustarnos al orden en que han sido señalados los errores imputados al tribunal inferior, la responsabilidad de la codemandada apelante The Escambrón Development Company, Inc.

Conforme al artículo 1444 del Código Civil (ed. 1930), el arrendador está obligado "a entregar al arrendatario la cosa objeto del contrato." Esta obligación, según Scaevola, exige del arrendador que entregue la cosa arrendada "en tal situación que permita al arrendatario hacer de ella el disfrute que se proponía." 24 Scaevola, Código Civil, Parte Primera, 513. "A falta de expresión del estado de la finca al tiempo de arrendarla, la ley presume que el arrendatario la recibió en buen estado, salvo prueba en contrario." Artículo 1452, Código Civil (ed. 1930).

De acuerdo con los hechos que estimó probados el tribunal inferior—ampliamente sostenidos por la prueba—"los pilotes y vigas que se desplomaron el día del accidente se encontraban en avanzado estado de deterioro y esta condición databa desde cuatro años anterior al otorgamiento del contrato de arrendamiento." Toda la prueba en autos sobre el estado de deterioro de esa parte del edificio principal de

las propiedades subarrendadas a Quiñones, que no fué controvertida, no deja lugar a dudas de que la misma ya amenazaba ruina cuando Quiñones entró en su posesión a virtud del contrato con la codemandada apelante.

Existiendo ese estado ruinoso del salón de baile del Escambrón Beach Club a la fecha del otorgamiento del contrato de subarrendamiento, la inseguridad y el peligro para aquellas personas que concurrieran a los bailes que como parte de su negocio Quiñones ofrecía al público en dicho salón, eran evidentes. Es indefectible la conclusión de que el edificio principal del Escambrón Beach Club, en la parte de su salón de baile, no estaba en la indicada fecha en estado de servir para el uso a que se destinaba y para el cual le fué arrendado a Quiñones.

El artículo 1807 provee que "el propietario de un edificio es responsable de los daños que resulten de la ruina de todo o parte de él, si ésta sobreviniere por falta de las reparaciones necesarias." El estado de deterioro a que llegaron las vigas y pilotes que servían de soporte a la plataforma del salón de baile, que a la fecha del otorgamiento del contrato de subarrendamiento amenazaba ruina por falta de las reparaciones necesarias para proporcionar adecuada resistencia a dicha plataforma, produjo cuatro meses más tarde y por la misma causa de falta de reparación el desplome de dicha plataforma y los consiguientes daños a los demandantes. No tenemos que considerar aquí, ante los daños sufridos por terceras personas como consecuencia del desplome de la referida plataforma, si bajo la Cláusula dieciocho del contrato de arrendamiento Quiñones venía obligado para con The Escambrón Development Company, Inc., a hacer las reparaciones del edificio principal del Escambrón Beach Club en la forma limitada a que se refirió el tribunal inferior en su sentencia, como sostiene Quiñones, o sin limitaciones, según sostiene The Escambrón Development Company, Inc.

A los fines de la responsabilidad de la subarrendadora frente a las terceras personas que sufrieron daños por el estado ruinoso a que llegó la plataforma del salón de baile, es inmaterial la interpretación que se dé a la referida cláusula en cuanto a si Quiñones asumió limitada o plenamente la obligación contractual de hacer reparaciones en el edificio principal. Ni en uno ni en otro caso descarga su responsabilidad, frente a terceros, The Escambrón Development Company, Inc. A lo sumo, de prevalecer su contención en el sentido de que Quiñones asumió la obligación, bajo la citada Cláusula dieciocho, de realizar todas las reparaciones necesarias dentro de los términos y condiciones allí estipulados, la subarrendadora tendría derecho a repetir contra Quiñones por cualquier indemnización que por concepto de daños y perjuicios tuviere que satisfacer a los demandantes. Así se expresa Manresa sobre este extremo en sus Comentarios al Código Civil Español:

"El dueño que, en virtud de la obligación impuesta por el citado art. 1.907, [1807 de nuestro Código Civil, ed 1930] repare el daño causado por la ruina de un edificio de su propiedad, ¿tendrá derecho a reintegrarse de alguien de lo que hubiere satisfecho por tal concepto? El artículo que examinamos no lo dice, ni ninguno de los del presente capítulo contiene precepto alguno sobre ello, pero de ese silencio de la ley no debe deducirse la absoluta carencia de acción para dicho reintegro.

"En efecto, el art. 1.907 [1807, Código Civil, ed. 1930] hay que entenderlo en relación con el párrafo tercero del 1.559 [1449, Código Civil, ed. 1930] y con la disposición general y amplísima del 1.902 [1802, Código Civil, ed. 1930]. Según el primero de ellos, el propietario podrá repetir contra el arrendatario, si estuviese arrendada la finca, y éste no pusiere en conocimiento de aquél, en el más breve plazo posible, la necesidad de las reparaciones precisas para conservarla en estado de servir para el uso a que se hallase destinada; pues en dicho caso será responsable el arrendatario de los daños y perjuicios que se ocasionaren al propietario por la falta de aviso y de sus consecuencias, entre las cuales, necesaria e indudablemente, debe contarse la indemnización que hubiere tenido que satisfacer al

perjudicado por los daños que resultaren de la ruina total o parcial del edificio arrendado. Así resulta del precepto contenido en la disposición legal citada, la cual está de acuerdo en este punto con lo que disponía la ley 7ª, tít. VIII de la Partida 5ª. Resulta, pues, que la falta de noticia o la ignorancia de la necesidad de las reparaciones no exime al propietario de la obligación de reparar los daños de que nos ocupamos, pero le da derecho para repetir contra el arrendatario que omitió el aviso necesario, y como no es motivo de exención la falta de éste o la ignorancia de la necesidad de las reparaciones por ella motivada, no puede alegar como excepción dicha ignorancia, ni tiene, por tanto, que probarla en el pleito promovido por el damnificado.

"Además, si la falta de reparaciones determinante de la ruina total o parcial del edificio dependió, no de la voluntad del propietario, sino de un tercero, como por ejemplo, si no se ejecutaron dichas reparaciones con la prontitud debida, o si dejaron de hacerse por culpa de la persona a quien se encomendara oportunamente su ejecución, dándose con ello ocasión a que sobreviniera por tal motivo la ruina; en dicho caso, como en todos los semejantes o análogos, podrá repetir contra el que dió ocasión al daño con arreglo al principio consignado en el art. 1.902." [1802, Código Civil, ed. 1930] 12 Manresa, Comentarios al Código Civil, ed. 1907, págs. 638–9.

Pero nunca quedaría exonerada de su responsabilidad frente a terceros, pues en cuanto a los derechos de éstos las relaciones contractuales entre los codemandados no juegan papel alguno.

No constituye defensa para la subarrendadora el que ésta no hubiere estado, previamente al otorgamiento del contrato de referencia, en la posesión material de la propiedad, por tenerla arrendada a otra persona, y que por lo tanto desconocía el estado de deterioro y ruina en que parte de la misma se encontraba. Ella tenía la obligación de entregarla al subarrendatario en estado de servir para el uso a que estaba destinada y en situación de seguridad que le permitiera a éste disfrutar de ella como se proponía, que era el mismo para el cual fué construída y dedicada por la subarrendadora.

Las decisiones de este Tribunal en *Roa* v. *Puig et al.*, 19 D.P.R. 386; *Pérez* v. *Gandía*, 32 D.P.R. 562; *Miranda* v. *Méndez*, 50 D.P.R. 850; *Torres* v. *Fernández*, 56 D.P.R. 482; *Ortiz* v. *McCormick Steamship Co.*, 57 D.P.R. 560; *Vázquez* v. *Antuñano*, 61 D.P.R. 770; *Arroyo* v. *Caldas*, 68 D.P.R. 689 y *Ramírez* v. *Hotel Condado*, 68 D.P.R. 953, no militan en contra de la conclusión a que aquí llegamos. En ninguno de dichos casos se trataba del estado ruinoso de la propiedad a la fecha del contrato de arrendamiento. Y en ninguno se suscitó por el propietario de la propiedad la defensa de haber descargado su responsabilidad en virtud de pacto en contrario en el contrato de arrendamiento. En todos ellos, con la excepción del de *Ortiz* v. *McCormick Steamship Co.*, supra, en que se demandó por el subarrendador al subarrendatario en cobro de cánones de arrendamiento y se contrademandó por éste en daños y perjuicios, se demandó únicamente al dueño o dueños de la propiedad arrendada. En consecuencia, desestimamos aquellos errores señalados por la codemandada apelante que giran alrededor del contrato de arrendamiento y su Cláusula dieciocho, así como de su interpretación dada por el tribunal inferior a base de las conversaciones que precedieron al otorgamiento de dicho contrato. Igualmente desestimamos el error por el que sostiene que la única parte responsable a los demandantes lo es el subarrendatario Francisco Quiñones. Sin embargo, hemos de dar seguidamente consideración al segundo señalamiento hecho por dicha codemandada apelante, que equivale a los señalamientos primero y segundo de los demandantes apelantes, en el sentido de que fué error del tribunal inferior concluir que Francisco Quiñones ignoraba el estado de las vigas y que no hubiera podido determinarlo mediante una inspección ordinaria y razonable.

La prueba incontrovertida demostró que a la fecha en que se formalizó el contrato de arrendamiento entre Quiñones y The Escambrón Development Company, Inc., y

tomó aquél posesión de los edificios existía en el piso o plataforma del salón de baile una grieta, que Quiñones pudo observar, que medía unos 30 pies de largo, llegando en algunos sitios a ¾ pulgadas de ancho, localizada más o menos por el sitio donde luego ocurrió el desprendimiento del piso. La grieta, conforme declaró el propio codemandado Quiñones, tenía como ½ pulgada de profundidad y la hizo rellenar con terrazo. Según él, nunca inspeccionó el piso por debajo ni sabe si se inspeccionó.

No encontramos base para alterar la conclusión del tribunal inferior al efecto de que Quiñones no conocía el estado de las vigas. Sin embargo, no podemos decir lo mismo respecto a la conclusión de que no hubiera podido determinar el estado de deterioro y ruina en que se encontraban mediante una inspección ordinaria y razonable. La existencia de una grieta de 30 pies de largo en la plataforma de concreto que constituía el salón de baile, construída la misma, en parte, sobre las aguas del mar, era indicio suficiente para que Quiñones investigara el estado de los pilotes y las vigas que servían de soporte al piso, sobre todo conociendo que había pilotes que estaban enclavados dentro del mar, y el sitio de la grieta, por donde luego se derrumbó el piso, correspondía a la localización de esos pilotes. Una persona prudente y razonable debió haber pensado en determinar, mediante un reconocimiento de los pilotes y las vigas, la causa de la grieta, que era el aviso de que algo andaba mal con dicha plataforma.

La situación que presentaban las vigas y columnas del piso que se desplomó, según la descripción que hizo el ingeniero J. M. Canals—testigo del codemandado apelado Quiñones—quien verificó una inspección luego del derrumbe, era tal que las zapatas estaban al aire; el concreto alrededor de las columnas había sido desgastado por la acción de *papel de lija* de las olas; columnas de 10 × 10 habían sido desgastadas o "comidas" alrededor, hasta llegar a un círculo

de 2 ó 3 pulgadas; el hormigón del piso tenía las varillas descubiertas; la acción del mar descubrió la fundación de las zapatas de varias de las columnas, sacándolas de sus bases hacia el mar; una columna tenía su base totalmente al aire y otra estaba totalmente cercenada por la acción de papel de lija de la arena. En cuanto a si una persona hubiera podido notar el estado de dichas vigas o pilotes que soportaban la plataforma del salón de baile, así se expresó en repreguntas dicho testigo, después de haber declarado sobre sus hallazgos al verificar su inspección:

"P. ¿Una persona, un capataz que ha trabajado en obras de esa naturaleza que hubiera entrado a mirar, hubiera notado esas cosas?

"R. Hubiera tenido que notarlas porque tienen que llamarle la atención a cualquiera persona que entre ahí abajo.

"P. ¿En su opinión, si una persona que hubiere tenido experiencia en construcción, quien quiera que fuera, hubiera hecho una inspección de la parte debajo del piso del Salón de las Naciones, allá para principios de octubre, 1946, hubiera notado esa condición ruinosa que usted la llama?

"R. Tres años antes de esa fecha la hubiera notado. Tenía que haberla visto."

El hecho de que Quiñones no realizara una inspección por debajo de la plataforma,(5) según declaró, no lo releva de su responsabilidad para con los demandantes. La extensión de la grieta en el piso del salón de baile y las demás circunstancias ya apuntadas debieron haber llevado a Quiñones a observar cuidado razonable para determinar la causa

---

(5) Hubo prueba de parte de la codemandada The Escambrón Development Company, Inc.—el testigo Amaury Díaz Benítez, contratista—en el sentido de que a solicitud de Quiñones hizo una inspección ocular como 3 ó 4 días después de tomar Quiñones en arrendamiento el Escambrón Beach Club y que le hizo las recomendaciones correspondientes en cuanto al techo, paredes, pintura, marquesina y el piso; que en el piso había una grieta de 42 pies por 9 pulgadas de largo según medida que tomó; que "la grieta formaba una pequeña planetita que en su punto más alto tenía como tres pulgadas sobre el nivel del resto del piso"; que le informó a Quiñones que esa grieta debía investigarse; que él la investigó en compañía de su maestro de obras, Sr. Grafal; que se metieron por debajo de

de esa grieta. El no haberlo hecho constituye negligencia de su parte y es responsable a los demandantes, conjuntamente con la codemandada The Escambrón Development Company, Inc., por virtud de dicha negligencia.

El derecho de los demandantes a recobrar de ambos codemandados o de cualquiera de ellos no puede ser derrotado por las obligaciones contraídas entre las partes contratantes. Si bien The Escambrón Development Company, Inc., es responsable al dejar que se tornara ruinosa, por su falta de reparaciones, la plataforma del salón de baile, Quiñones, por su propia negligencia en la explotación de su negocio al dejar de ejercer el debido cuidado y celo razonables para determinar las causas del defecto—visible—en el piso, incurrió en responsabilidad para con el público, al que invitaba y el que concurría a su negocio. La responsabilidad de Quiñones para con los demandantes surge de las disposiciones del artículo 1802 del Código Civil, ed. 1930, y no del contrato de subarrendamiento. A esos fines véase *Vázquez* v. *Antuñano*, supra. Cuando un daño es resultado de la negligencia combinada de varias personas, tales personas son responsables solidaria y mancomunadamente al perjudicado pudiendo incoarse una acción contra uno o todos los que ocasionen el daño. *Cubano* v. *Jiménez et al.*, 32 D.P.R. 167; *González* v. *White Star Bus Line, Inc.*, 53 D.P.R. 659; *Rivera* v. *Great Am. Indemnity Co.*, 70 D.P.R. 825; *García* v. *Gobierno de la Capital*, 72 D.P.R. 138.

Los casos de *Folkman* v. *Lauer*, 91 Atl. 218 (Pa., 1914);

---

la plataforma y encontraron las vigas de concreto rajadas completamente por su eje longitudinal, las varillas al descubierto y enmohecidas; algunas de las columnas que sujetaban las vigas estaban al aire, el "rail" a 6 u 8 pulgadas debajo de la arena y en otro extremo la viga, aparte de estar rajada a lo largo del eje longitudinal, estaba también rota o agrietada verticalmente.

Dicho testigo declaró habérselo dicho a Quiñones advirtiéndole que era peligroso seguir haciendo lo que él quería hacer, "repicar y poner un poco de terrazo para cubrirlo otra vez." A esta prueba evidentemente no dió crédito el tribunal inferior y no dependemos de ella para el resultado a que llegamos en estos recursos.

*Junkermann* v. *Tilyou Realty Co.*, 108 N.E. 190 (N.Y., 1915) y *Oxford* v. *Leathe*, 43 N.E. 92 (Mass., 1896), citados por los codemandados apelados, no son autoridad para regir este caso bajo los hechos que aquí concurren y las reglas de derecho que dimanan de nuestro Código Civil.

Siendo ello así, debemos concluir· que el segundo error señalado por los demandantes apelantes—y segundo también de los señalados por la codemandada apelante—fué cometido; mas ello, en cuanto a esta última, no· le releva de su responsabilidad para con los demandantes apelantes. *En consecuencia, las sentencias en los cuatro pleitos incluídos en el recurso de apelación 10,227, en los cuales los demandantes figuran como apelantes, serán modificadas en el sentido de declarar también con lugar las demandas contra los codemandados Francisco Quiñones y United States Casualty Company, con igual pronunciamiento sobre costas y honorarios de abogado, y así modificadas serán confirmadas; y las sentencias en los pleitos que figuran ante este Tribunal bajo los recursos de apelación números 10,246 y 10247, en los cuales los demandantes no apelaron, serán confirmadas.*