ESTHER PRADO MARTORELL, demandante y apelada, *v.* FRANCISCO QUIÑONES, ESCAMBRÓN BEACH CLUB HOTEL CORP., ESCAMBRÓN DEVELOPMENT CO., y UNITED STATES CASUALTY CO., demandados y apelantes.

Número 10421

*Sometido:* 10 de enero de 1952. *Resuelto:* 11 de mayo de 1955.

---

([6]) En unión a The Escambrón Development Company, Inc., y United States Casualty Co.

*Hugh R. Francis, Vicente M. Ydrach y Emilio de Aldrey,* aboga-
dos de los apelantes; *Charles R. Hartzell, Rafael O. Fernán-
dez, P. Juvenal Rosa y José L. Novas,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opi-
nión del Tribunal.

Esther Prado Martorell inició el presente pleito de da-
ños y perjuicios contra Francisco Quiñones y Escambrón
Beach Club Hotel Corp., arrendatarios de los edificios y
facilidades recreativas situadas en San Juan y conocidas
como Escambrón Beach Club; contra su aseguradora United
States Casualty Company, y contra The Escambrón Devel-
opment Company, Inc., propietaria y arrendadora de di-
chos edificios y facilidades recreativas.

La demanda, en síntesis, exponía los siguientes hechos
como base de la reclamación: El 2 de mayo de 1947 se lle-
vaban a cabo ciertas reparaciones en uno de los edificios
del Escambrón Beach Club, conjuntamente, por los deman-
dados Francisco Quiñones y The Escambrón Development
Company, Inc. Para servir de pasadizo y dar acceso a apar-
tamientos en un edificio contiguo, los empleados de los de-
mandados colocaron un tablón suelto, sin poner aviso o signo
alguno que indicara peligro. El sitio en que fué colocado
dicho tablón no estaba suficientemente alumbrado. Alrede-
dor de las 9:30 de la noche, la demandante se dirigía a uno
de dichos apartamientos, ocupado por Alexander Storik, en
compañía de éste, y al pasar sobre el tablón que servía de
pasadizo, el mismo se movió bruscamente, perdiendo la de-
mandante el equilibrio y cayendo sobre su lado derecho, con
el pie izquierdo aprisionado entre dicho tablón y escombros
de los que allí había. Como consecuencia de esa caída la
demandante sufrió tres facturas en el tobillo izquierdo y la
dislocación del mismo, teniendo que recluirse en cama, vién-
dose impedida de atender su trabajo como administradora

de la Pan American Crafts, Inc., por un período de cuatro meses y medio, durante el cual sufrió de flebitis en la pierna izquierda. Las lesiones le produjeron "intensos dolores físicos, angustias y sufrimientos morales y mentales" y aún al momento de radicarse la demanda sufría "frecuentemente serias crisis nerviosas como consecuencia del referido accidente." Incurrió en gastos por tratamiento médico y hospitalización en la suma de $2,213.50. El total de daños sufridos los calculó en $25,000, suma que solicitó por tal concepto. El accidente se alegó causado exclusivamente por la negligencia de los demandados Francisco Quiñones, Escambrón Beach Club y The Escambrón Development Company, Inc., "al colocar el tablón que se usaba como pasadizo sin tomar las precauciones debidas para la seguridad de las personas que sobre él tenían que transitar, al dirigirse a los mencionados apartamientos, al no colocar ningún aviso o signo que indicara peligro al cruzar el tablón y al no tener suficiente alumbrado en dicho sitio ni nada de qué agarrarse para evitar una caída".

En su contestación, The Escambrón Development Company, Inc., aceptó su carácter de arrendadora así como el hecho de que para la fecha alegada en la demanda se efectuaban ciertas reparaciones en el piso del Salón de las Naciones, pero negó que tuviera intervención de clase alguna en las mismas, negando también los demás hechos esenciales alegados.

Por su parte, los otros tres codemandados, al contestar conjuntamente, aceptaron que para el 2 de mayo de 1947 el demandado Francisco Quiñones hacía negocios bajo el nombre de Escambrón Beach Club; que la demandada Escambrón Beach Club Hotel Corp. era una corporación organizada y existente bajo las leyes de Puerto Rico cuyo accionista principal era el demandado Francisco Quiñones y que la referida corporación se hizo cargo de todas las propiedades, derechos y obligaciones de dicho demandado Fran-

cisco Quiñones, así como que la demandada United States Casualty Company tenía para la fecha alegada en la demanda un contrato de seguro con dicho codemandado Quiñones. Aceptaron también que "en la indicada fecha de 2 de mayo de 1947 se llevaban a efecto en el Escambrón Beach Club trabajos de reparación", pero alegaron que "dichas obras se realizaban independientemente por la co-demandada The Escambrón Development Co., por cuenta de ésta, y sin que el otro co-demandado Francisco Quiñones tuviera intervención o ingerencia alguna." Negaron las alegaciones sobre negligencia así como también—por falta de información suficiente —que la demandante sufriera daños de clase alguna.

Luego de un juicio en sus méritos, el tribunal a quo dictó sentencia "declarando con lugar la demanda y en su consecuencia condenando a los· demandados Francisco Quiñones y/o Escambrón Beach Club Corporation, The Escambrón Development Company y a la demandada United States Casualty Company, mancomunada y solidariamente, a pagar a la demandante Esther Prado Martorell, la suma de $19,966 por los daños y perjuicios sufridos por ésta comprendiendo dicha suma $3,500 por los sufrimientos físicos de la demandante, la suma de $6,000 por las angustias mentales y alteración y desequilibrio de su sistema nervioso, la suma de $3,000 por la incapacidad parcial permanente de un 30% de la pierna izquierda de la demandante, $4,250 por los salarios y otras compensaciones dejadas de percibir por ella y $3,216.00 por los gastos en que la demandante fué obligada a incurrir hasta la fecha del juicio; más las costas y la suma de Cuatro Mil Dólares ($4,000) para honorarios de los abogados de la demandante." [1]

Contra esa sentencia han interpuesto el presente recurso de apelación, de una parte The Escambrón Development

[1] La responsabilidad de la United States Casualty Company en su capacidad de aseguradora de Francisco Quiñones y/o Escambrón Beach Club Hotel Corp., bajo la póliza, se limita a la suma de $10,000.

Company, Inc., y de la otra Francisco Quiñones, Escambrón Beach Club Hotel Corp. y United States Casualty Company.

The Escambrón Development Company, Inc., imputa al tribunal sentenciador error (1) "al formular dentro de sus conclusiones de hecho núm. 12 una conclusión en el sentido de que debido a su inhabilidad para trabajar en la producción y diseño de ropa de mujer durante parte del año 1947 Esther Prado Martorell no percibió por dicho año bonificación de clase alguna y al conceder a la demandante en su sentencia compensación alguna dejada de percibir por ella que no fuera los salarios que ella dejó de percibir durante los cuatro meses y medio que estuvo ausente de su trabajo"; (2) "al concluir en su conclusión de hecho núm. 11 que en la opinión del Dr. Montilla, la demandante tendría que recluirse en una institución en los EE. UU. por un período aproximado de un año y medio, así como también erró al conceder a la demandante la suma de $6,000 por las angustias mentales y alteración y desequilibrio de su sistema nervioso que según expresa la corte requiere tratamiento médico adicional y hospitalización en una institución en los EE. UU."; (3) "al concluir en su conclusión de hechos núm. 4 que The Escambrón Development Co., Inc., tenía bajo su absoluto control y dominio todo el piso del Salón de las Naciones"; (4) "al concluir en su conclusión de hechos núm. 4 que el contratista a cargo de las obras de reconstrucción prohibió al arrendatario Francisco Quiñones Aguiar el uso del portón que da acceso a la calle y que está localizado entre el edificio principal y los apartamientos"; (5) "al concluir en su conclusión de hechos núm. 5 que durante la reconstrucción del piso del Salón de las Naciones los inquilinos e invitados del Escambrón Beach Club continuaron utilizando corrientemente el paso por la esquina del salón sin objeción alguna por parte de los agentes y empleados del Escambrón Development Company, Inc."; (6) "al concluir en su conclusión de hechos núm. 9 que The Escambrón Development Co.

no proveyó y/o facilitó a los inquilinos e invitados del Escambrón Beach Club otra forma de acceso seguro a los apartamientos"; (7) "al concluir que The Escambrón Development Co., Inc., incurrió en negligencia conjuntamente con The Escambrón Beach Club & Hotel Corp. y/o Francisco Quiñones y que la negligencia de éstas fué la causa próxima del accidente sufrido por la demandante, así como también incurrió en error al condenar a The Escambrón Development Co., Inc., a pagar a la parte demandante suma alguna de dinero en concepto de daños y perjuicios", y (8) "al conceder a la parte demandante la suma de $4,000 para honorarios de abogado ya que dicha suma resulta a todas luces excesiva."

Por su parte, los otros tres apelantes le imputan error (1) "al declarar con lugar la demanda condenando a los demandados apelantes Francisco Quiñones y/o Escambrón Beach Club Corp. y a la aseguradora de Francisco Quiñones, U. S. Casualty Co., conjuntamente con la otra co-demandada The Escambrón Development Co., Inc., y al así hacerlo determinando que existía también responsabilidad de parte de los codemandados-apelantes aquí comparecientes con respecto al accidente sufrido por la demandante-apelada"; (2) "al apreciar la .evidencia ofrecida y resolver que fué Francisco Quiñones quien hizo colocar un tablón entre el triángulo o esquina formado por el hueco de la puerta en la tercera arcada contigua a las cocinas y la puerta del Salón de las Naciones que daba acceso al piso que conduce a los apartamientos"; (3) "al dictar sentencia en contra de Escambrón Beach Club Corp. conjuntamente con Francisco Quiñones"; (4) "al dictar sentencia condenando a los demandados a pagar $3,500 por sufrimientos físicos de la demandante y $6,000 por angustias mentales, y alteración y desequilibrio en su sistema nervioso, por constituir una indemnización doble por el mismo daño y por ser a la vez la segunda una compensación impropia en un caso de esta naturaleza"; (5) "al dictar

sentencia condenando a los demandados a pagar una indemnización en calidad de compensación por los daños recibidos ascendente a la suma de $12,500 siendo ésta excesiva"; (6) "al apreciar la evidencia y resolver que la demandante debido a su inhabilidad para trabajar durante parte del año de 1947, como consecuencia del accidente sufrido, no percibió por dicho año bonificación de clase alguna y concederle una partida por este concepto en calidad de indemnización", y (7) "al condenar a los demandados a pagar la suma de $4,000 en concepto de honorarios de abogado siendo dicha suma del todo excesiva por no existir temeridad de parte de los demandados en la defensa de este caso."

Debido a que varios de los señalamientos de error de la apelante Escambrón Development Company, Inc., coinciden con algunos de los señalamientos de los otros apelantes, los consideraremos, cuando así ocurra, conjuntamente.

■■ El primer señalamiento de la apelante Escambrón Development Company, Inc., es similar al sexto de los señalados por los demás apelantes. El mismo se funda en que el tribunal, dentro de la partida "$4,250 por salarios y otras compensaciones dejadas de percibir" concedió indebidamente indemnización por otro concepto que no fué el de los salarios dejados de percibir por la demandante. Habiendo el tribunal inferior concluído que la demandante "dejó de percibir durante esos cuatro meses y medio en el año 1947 su salario a razón de $500 mensuales" es claro que de la partida de $4,250 concedida, $2,000 son en concepto de "otras compensaciones dejadas de percibir".

Todos los apelantes sostienen que no procede la concesión de esta partida porque la misma no fué reclamada en la demanda como un daño especial y además porque constituye compensación por daños de carácter especulativo y remoto. La apelante Escambrón Development Company, Inc., sostiene, además, que la prueba demuestra que la demandante no tenía derecho contractual alguno a percibir dicha partida

y que el tribunal no expresa, en sus conclusiones de hecho o en su sentencia, de dónde proceden esos $2,000 ni cómo llegó a concluir que ella tenía derecho a dicho importe. Los demás apelantes sostienen, además, que el tribunal no tenía base para determinar que la demandante dejó de percibir "otras compensaciones" por la mencionada suma.

La Regla 9(g) de las de Enjuiciamiento Civil establece que "Cuando se reclamen daños especiales, sus distintas partidas se alegarán específicamente." El mismo principio existía antes de la aprobación de dichas Reglas. *Tuya* v. *White Star Bus Line, Inc.*, 59 D.P.R. 790; *Torres* v. *Ramírez*, 22 D.P.R. 450; Sutherland *on Damages*, 3ra. ed., tomo 4, sec. 1247, pág. 3622 *et seq.;* Joyce *on Damages* (1903), tomo 1, sec. 240, pág. 291 y 292; McCormick *on Damages*, (1935), pág. 314; Sedgwick *on Damages*, 9na. ed., tomo 4 sec. 1261, págs. 2592 a 2594. En consecuencia, daños consistentes en ingresos dejados de percibir, por constituir un daño especial, deben alegarse específicamente. Sin embargo, la alegación hecha en este caso, interpretada con el propósito de hacer justicia sustancial—Regla 8(f) de las de Enjuiciamiento Civil—de que, debido a la caída descrita la demandante sufrió tres fracturas y la dislocación del tobillo izquierdo, "por lo cual tuvo que recluirse en cama y se vió impedida de atender a su trabajo como *manager* de la Pan American Crafts, Inc., durante cuatro meses y medio" es lo suficientemente específica para que pueda presentarse evidencia y recobrarse indemnización por ingresos dejados de percibir durante el indicado período, *Betances* v. *Autoridad de Transporte*, 73 D.P.R. 223; McCormick, ob. cit., pág. 314; Sutherland, ob. cit., págs. 3623 y 3624; Joyce, ob. cit., sec. 241, págs. 292 *et seq.*, ya que bajo ella los demandados estaban razonablemente prevenidos de que la demandante intentaba recobrar daños por dicho concepto.

La contención de que la indemnización concedida es una por daños de carácter especulativo requiere que ana-

licemos la naturaleza de la compensación que en adición a su salario recibía la demandante. Veamos, pues, la evidencia que con relación a este extremo tuvo ante sí el tribunal sentenciador.

Según declaró la demandante, para la fecha del accidente ella recibía un salario de $500 mensuales de la Pan American Crafts, Inc., En adición a ese salario recibía un bono.([2]) Dicho bono "dependía mucho de los esfuerzos míos, de que los embarques fueran grandes", ya que "además de yo administrar la factoría yo diseño." "El año anterior [1946] me dieron tres mil doscientos dólares ($3,200) de bono." No recibió bono alguno para el año 1947. Lo atribuye al hecho de que "no estaba en disposición de poder diseñar y estar tan activa como el año anterior".

En la repregunta—turno de los codemandados Escambrón Beach Club, Francisco Quiñones y U. S. Casualty Co. —declaró que el año del accidente era un año bueno, "pudo haberlo sido pero con mi accidente la firma tuvo muchas cancelaciones y yo no pude diseñar porque yo diseño ropa interior y blusas y trajes y precisamente por eso había venido Mr. Alex, para el trabajo de diseño". Dijo que además de recibir órdenes de Estados Unidos para que se hicieran en la factoría aquí, "además de eso yo aquí diseño y ofrezco mercancía a distintas tiendas y vienen los compradores de Estados Unidos a ponerse de acuerdo conmigo y tomo órdenes directamente sin tener que venir nada de New York; son órdenes de los compradores que me visitan a mí". En el año anterior [1946] tomó aquí órdenes directamente de sus diseños por más de $100,000. En 1947 "yo estaba preparando mi línea de diseños para entonces ponerme de acuerdo con las distintas tiendas o compradores para ofrecerles mi línea diseñada". Por el accidente no pudo continuar su trabajo de diseño. En 1945 recibió una bonificación, ascendente

---

([2]) Tanto la apelada como los apelantes se refieren a este ingreso adicional llamándole indistintamente *bono* o *bonificación*.

a más de dos mil dólares; "fueron como dos mil y pico de pesos, próximos a los tres mil pesos". Para el 1948 no ha recibido bono. "En el 1949 me arreglan lo que sea del 1948". Más adelante dijo que para ese año de 1948 no ha recibido el bono "porque la factoría ha trabajado poco". Cuando comenzó a trabajar en la factoría hubo un convenio verbal en el sentido de que por todo trabajo que "hiciera extra de diseño y para acrecentar el negocio" recibiría en pago un bono. No sabe cómo se liquidaba el bono. Éste estaba basado en su trabajo.

Repreguntada por el abogado de la codemandada Escambrón Development Company, Inc., declaró que desde que comenzó a trabajar como administradora de la factoría recibe bonos anuales. El convenio del bono fué uno verbal hecho con el Sr. Morris Storyk. Lo explicó en la siguiente forma: "Sencillamente que de acuerdo al trabajo que se hacía en Puerto Rico bien de órdenes mandadas de New York para nosotros ponerlas en ejecución, yo recibiría un bono, una bonificación extra de acuerdo al trabajo que tuviéramos aquí en Puerto Rico. Ahora que trabajando otro negocio extra que yo consiguiera por medio de diseñar yo y entenderme directamente con compradores también recibiría una bonificación extra, lo cual ocurrió en el 1945, en el 1946." Le pagan en la actualidad los $500 mensuales por la administración de la factoría pero "no he podido diseñar porque me siento muy nerviosa y no tengo tranquilidad". La imposibilidad de diseñar le ha impedido recibir los bonos que antes recibía.

*Morris Storyk*, Presidente de la Corporación dueña de la factoría que dirigía la demandante para la fecha del accidente, declaró, sobre el extremo que nos ocupa, que "la demandante estaba recibiendo un salario de quinientos dólares al mes de la factoría y además ciento cincuenta dólares mensuales de la tienda de venta al detall". Además de su salario "ella recibía bonos anuales, dependiendo de sus esfuer-

zos." Recibió su último bono en enero de 1947, correspondiente al año 1946, el cual montaba a poco más de tres mil doscientos cincuenta dólares. No se le pagó bono adicional en el 1947 "porque ella no podía desarrollar nuevos diseños y promover la venta de los mismos debido a su estado de salud".

En la repregunta declaró que la demandante en 1947 "no se ganó el bono como en el año 1946". El bono no era un sueldo, no era una dádiva tampoco, "se pagaba por algo más". En el 1947 fueron las condiciones del negocio las que decidieron que la demandante no era acreedora al bono. "El negocio no estaba produciendo. No había nada que pagar". Atribuye que no hubiera ganancias en dicho año a la enfermedad de la demandante. En el examen redirecto explicó cómo se le daba la llamada bonificación a la demandante: "asigné a la señorita Prado un grupo de veintiocho tiendas departamentales, desde Nueva York a California. Ella creaba ropa interior para estas tiendas departamentales, hecha a mano. Ella las diseñaba. Ella estuvo muchos días con los compradores, quienes vinieron a Puerto Rico. Ella estableció los precios, ella manufacturó los artículos; ella los embarcó para estas tiendas y consiguió de estos compradores juntos, en nuestra oficina, ciento sesenta mil dólares por adelantado y por eso ella recibió un bono especial del dos por ciento." En esa forma fué que se llegó a la cantidad de $3,250 pagados a la demandante en 1946. En el 1947 no se le asignaron las tiendas por departamentos "era imposible asignárselas, no las asigné. No las pudimos asignar porque la salud de ella no lo permitía".

Repreguntado nuevamente declaró que los ciento sesenta mil dólares tomados en órdenes en 1946 y a base de los cuales se le pagó a la demandante el bono de $3,250 "vinieron de veintiocho tiendas de departamentos de Estados Unidos". Fueron contratos que duraron "hasta cerca de fines del año". La terminación de esos contratos no tuvo nada que ver con

el accidente de la demandante "excepto que ella no pudo diseñar nueva mercancía y no pudimos invitar a estas tiendas para que volvieran a hacer nuevos contratos." El que se le concediera el bono a la demandante "depende del trabajo extra de ella." "No hay obligación. Definitivamente no."

Estas declaraciones establecen con suficiente claridad que la demandante recibía, además de su salario, un ingreso adicional proveniente de comisiones sobre las órdenes que de artículos por ella diseñados sirviera la factoría. Ese ingreso dejado de percibir al igual que si se tratara de un salario fijo, es recobrable en una acción como la presente. *Hirsch* v. *Kendrick*, 43 So.2d. 692 (1950); *Texas Electric Ry.* v. *Worthy*, 250 S.W. 710 (1923); *Gregory* v. *Slaughter*, 99 S.W. 247; McCormick ob. cit., sec. 87, pág. 361; *Cf.* Joyce, ob. cit., tomo 1, sec. 237, pág. 289. No milita contra esta teoría el hecho de que sea más difícil determinar, en casos en que el ingreso del demandante consista de comisiones, a cuánto asciende el daño sufrido. La regla que impide la concesión de daños inciertos o especulativos se ha dirigido, generalmente, contra la incertidumbre en cuanto a la existencia del daño en sí, no siendo impedimento para recobrar la falta de certeza que meramente afecte la cantidad o extensión del daño. Véase la anotación bajo el título "Uncertainty as to Damages", 78 A.L.R. 858. Y *Cf.* 46 Harv. L. Rev. 696. Una vez establecido satisfactoriamente que el daño existe, y que su causa próxima fué la acción u omisión del demandado, no puede caracterizarse el mismo de incierto o especulativo "no importando que la determinación de su cuantía sea aproximada, siempre que el cálculo descanse en una base razonable y no sea hijo del capricho o adivinación" *White Star Bus Line, Inc.* v. *Glens Falls Ind. Co.* 60 D.P.R. 859, 861; *Palmer* v. *Connecticut Ry. Co.*, 311 U. S. 544, 85 L. Ed. 336. Ante la consideración del tribunal inferior hubo evidencia relativa al monto de las comisiones obtenidas por la demandante en años anteriores. Esa es base suficiente

de la cual partir para determinar la razonable compensación a concederse por ingresos dejados de percibir en forma de comisiones para un año posterior. No creemos, por tanto, que se cometieron los errores señalados.

■■ Los señalamientos de error números 2 de la apelante The Escambrón Development Company, Inc., y 4 y 5 de los demás apelantes impugnan las partidas concedidas por sufrimientos físicos, angustias mentales y alteración y desequilibrio de su sistema nervioso, y la de incapacidad parcial permanente de un 30% de la pierna izquierda.

The Escambrón Development Company, Inc., se limita a impugnar la partida de $6,000 concedida como indemnización por las angustias mentales y alteración y desequilibrio del sistema nervioso de la demandante. Sostiene, en síntesis, que la razón aducida por el tribunal sentenciador para conceder tal indemnización es una supuesta opinión del Dr. Montilla, testigo de la demandante, en el sentido de que el desequilibrio nervioso sufrido por ésta requería tratamiento adicional y hospitalización en una institución de los Estados Unidos por un período aproximado de un año y medio, y que no habiendo el referido testigo en el curso de su declaración recomendado tal cosa, dicha partida debiera ser rebajada a $2,000. Sostiene asimismo que no se justifica la concesión de partida alguna por angustias mentales ya que éste no es un caso apropiado para la concesión de tales daños.

Los demás apelantes sostienen que la suma total de $12,500 concedida por las tres partidas mencionadas "está enteramente fuera de proporción y es del todo excesiva" y, además, que la indemnización de $3,500 por sufrimientos físicos de la demandante y la de $6,000 por angustias mentales y alteración y desequilibrio de su sistema nervioso constituyen una doble indemnización por el mismo daño. También sostienen que la indemnización por angustias mentales es impropia en casos de esta naturaleza.

En sus conclusiones de hecho el tribunal sentenciador se expresó, sobre este extremo, en la siguiente forma:

"11. Que como consecuencia de la caída sufrida por la demandante ésta sufrió dos fracturas en su tobillo izquierdo y una dislocación del mismo (fractura dislocación), las cuales le ocasionaron intensos dolores físicos y angustias mentales; tuvo que someterse a una operación para la reducción de las fracturas, su pierna izquierda fué enyesada y en ella sufrió agudos dolores, estuvo recluída en el Hospital Presbiteriano del 2 al 10 de mayo de 1947 y luego recluída en cama durante algún tiempo, sometida a tratamiento médico por los especialistas, Drs. Peter A. Sabatelle, Miguel A. Pardo, Eduardo Montilla y José A. Noya; se vió obligada a usar muletas y sillón de ruedas, necesitando de la ayuda de enfermeras para poder moverse; estuvo ausente de su trabajo con Pan American Crafts, Inc., cuatro meses y medio; se vió obligada a someterse, y a la fecha del juicio continuaba sometida a tratamiento médico y a un intenso tratamiento fisioterápico y como consecuencia de la fractura-dislocación empezó a padecer de artritis y continuaba padeciéndola a la fecha del juicio y quedó con una incapacidad parcial permanente de un 30% de las funciones de su pie izquierdo por el tobillo y asimismo sufrió, y continuaba sufriendo a la fecha del juicio, intensas crisis nerviosas y frecuentes síncopes, sufriendo uno en corte abierta durante el juicio, todo ello como consecuencia del accidente por ella sufrido y del tratamiento a que tuviera que someterse, y en opinión del Dr. Montilla, quien a la fecha del juicio continuaba atendiéndola, tendrá que recluirse en una institución en los Estados Unidos por un período aproximadamente de un año y medio."

En virtud de esa conclusión incluyó en su sentencia entre otras, las siguientes partidas:

$3,500 por los sufrimientos físicos de la demandante;
$6,000 por las angustias mentales y alteración y desequilibrio de su sistema nervioso; y
$3,000 por la incapacidad parcial permanente de un 30% de la pierna izquierda de la demandante.

Este Tribunal tiene resuelto que en casos como el presente la medida de los daños la constituye el gasto de la cu-

ración, el valor del tiempo perdido, la razonable compensación por el sufrimiento físico y mental sufrido y la rebaja permanente en la capacidad para ganar dinero. *García* v. *Fernández*, 52 D.P.R. 183; *Flores* v. *Sucrs. de Pérez Hnos.*, 29 D.P.R. 1046. Los sufrimientos o *angustias mentales*, una vez establecido el hecho de que el demandante los ha experimentado como resultado natural de la lesión, son compensables como elemento de los daños sufridos. *Ramírez* v. *American Railroad Co. of P. R.*, 17 D.P.R. 464; Joyce, ob. cit., tomo I, sec. 218, pág. 267; Sutherland, ob. cit., tomo 4, sec. 1243, págs. 3599, *et seq.;* McCormick, ob. cit., sec. 88, págs. 325, *et seq.;* Sedgwick, ob. cit., tomo II, sec. 484, págs. 920 *et seq.*

Los testimonios no contradichos de los Doctores Sabatelle y Montilla señalan el grado de incapacidad que ha sufrido la demandante así como los sufrimientos físicos y mentales que experimentó como consecuencia del accidente. Las partidas concedidas no las encontramos tan claramente inadecuadas e improcedentes al extremo que justifiquen una alteración por este Tribunal. *García* v. *Fernández,* supra; *Rodríguez* v. *American Railroad Co.,* 43 D.P.R. 493; *Aré et al* v. *Borinquen Sugar Co.,* 17 D.P.R. 914.

Es cierto que el Doctor Montilla, testigo de la demandante, no expresó opinión en el sentido de que el tratamiento futuro requerido por ésta tenía que ser en los Estados Unidos, ni que éste se prolongaría por año y medio, pero su testimonio estableció en forma clara y patente, el estado de la demandante como consecuencia del accidente, y el tratamiento a que tuvo que someterse. Su criterio fué el de que la demandante "debería someterse a tratamiento adicional *probablemente fuera de Puerto Rico.* Si bien no encontramos base en la prueba para la conclusión del tribunal respecto a la duración del tratamiento adicional a que tendría que someterse la demandante, ello por sí solo, no implica que la indemnización concedida, no siendo una desproporcionada

a la condición resultante del daño, deba alterarse. Por otro lado, aún si fuere errónea—bajo la teoría de que un desajuste del sistema nervioso deba más propiamente considerarse e indemnizarse como daños por sufrimientos físicos—el que se incluyera, en la partida concedida para indemnizar las angustias y sufrimientos mentales, la indemnización correspondiente a los daños sufridos por la demandante como resultado de la *alteración y desequilibrio* de su sistema nervioso—además de la indemnización concedida por los *sufrimientos físicos*—dicho error no puede conllevar la rebaja de la indemnización total por tales conceptos, pues no existe doble compensación por sufrimientos físicos. En la indemnización concedida por este concepto no se incluyó la correspondiente a los daños al sistema nervioso. Procedería, a lo sumo, un reajuste en las partidas, que no produciría consecuencias en el monto de la indemnización. El mismo iría dirigido únicamente a corregir la denominación de las partidas—no a afectar la cuantía propiamente dicha—o, expresado en otra forma, a reasignar, a su apropiada esfera, los daños que se consideraron realmente probados.

█ Los señalamientos números 3, 4, 5 y 6 de The Escambrón Development Company, Inc., y los números 1 y 2 de los demás apelantes impugnan en cierto modo las conclusiones que en los párrafos 4, 5 y 9 de sus conclusiones de hecho hizo el tribunal inferior. Veamos cuál fué la evidencia que sirvió de base a tales conclusiones.

En lo aquí pertinente, la prueba de la codemandada The Escambrón Development Company, Inc., intentó probar que una vez desplomado el piso del Salón de las Naciones, comenzó dicha demandada las obras de reconstrucción, y que, aunque había ocupado dicho salón para llevar a cabo las reparaciones, el codemandado Quiñones retuvo el control de una esquina del mismo colocando en ella un tablón que servía de pasadizo entre el comedor y el paseo que conducía a los apartamientos. A pesar de las objeciones del contratista a

cargo de la obra, los empleados de Francisco Quiñones, por orden de Estrella Cumpiano de López—quien para esa época era ayudante del Administrador—hicieron colocar el mencionado tablón para el uso de los empleados e inquilinos de su negocio. Durante las horas en que se trabajaba en las obras de reconstrucción del piso, los empleados de The Escambrón Development Company, Inc., quitaban el tablón, pues éste impedía conducir material de construcción hasta el Salón de las Naciones. Sin embargo, una vez terminado el trabajo diario, los empleados del otro codemandado Francisco Quiñones volvían a colocar el tablón y continuaban el uso del mismo.

La señora López dió instrucciones al contratista a cargo de la obra para que éste no permitiera la entrada a persona alguna que no fuera empleada del hotel, por un portón lateral —no la entrada principal—que quedaba cerca del Hotel Normandie. Dichas instrucciones fueron cumplidas estrictamente por los empleados de The Escambrón Development Company, Inc. A pesar de haber otras formas de acceso a los apartamientos, los empleados de Francisco Quiñones insistían en colocar el tablón a través de las obras en construcción, que utilizaban ellos y los inquilinos de los apartamientos, después de las horas laborables, cuando las personas a cargo de las obras abandonaban el lugar.

Por su parte, la prueba de los otros tres demandados, sobre este extremo, fué al efecto de que el arreglo del Salón de las Naciones se llevaba a cabo sin que ellos tuvieran intervención alguna en dichas obras y que si bien Francisco Quiñones siguió usando una parte del piso de dicho salón como paso hacia los apartamientos, fueron los empleados de The Escambrón Development Company, Inc., quienes colocaron el tablón para pasar del comedor al paseo que conducía a los mencionados apartamientos. Nunca persona alguna a nombre de The Escambrón Development Company, Inc., le prohibió que se utilizara el tablón como paso de sus huéspedes a los apartamientos. A pesar de las advertencias que la señora Estrella

Cumpiano de López hizo a los empleados de The Escambrón Development Company, Inc., en el sentido de que tal paso era peligroso, éstos mantuvieron el tablón en la condición de peligro ya apuntada.

Resolviendo el manifiesto conflicto en la prueba de los codemandados, el tribunal a quo llegó a las siguientes conclusiones de hecho:

"     .     .     .     .     .     .     .     .

"4. Que en, antes y después del día 2 de mayo de 1947 la codemandada The Escambrón Development Co. realizaba extensas reparaciones en todo el piso del Salón de las Naciones consistentes en la total reconstrucción de dicho piso, parte del cual se derrumbó con anterioridad habiendo surgido la necesidad de destruir el resto y que mientras realizaba dichas obras dicha codemandada tenía bajo su absoluto control y dominio todo el piso del salón de las naciones así como también, por sus agentes y empleados, controlaba en parte el acceso al Salón de las Naciones por la puerta contigua a las cocinas y una sección del paseo de concreto desde dicha puerta hasta un gran portón que daba acceso a la calle y localizado entre el edificio principal y los apartamientos, utilizando The Escambrón Development Co. dicho portón y la parte del paseo de concreto hasta la puerta contigua a la cocina, para la entrada y salida de camiones y carretones que conducían materiales de construcción y/o escombros de los depositados en el Salón de las Naciones durante la reconstrucción del piso del mismo.   La prueba demuestra que el contratista a cargo de las obras de reconstrucción prohibió al codemandado Quiñones el uso de ese portón.

"5. Que mientras se llevaban a cabo las obras de reconstrucción del piso del Salón de las Naciones, el codemandado Francisco Quiñones y The Escambrón Beach Club, continuaban operando y explotando "El Escambrón" manteniéndole abierto a todo el público mediante paga, y que sus inquilinos o subarrendatarios, y los invitados de éstos, continuaban ocupando los apartamientos situados en el lado este del edificio principal y a los cuales se llegaba pasando por la puerta del Salón de las Naciones contigua a las cocinas y que dichos inquilinos y los invitados de éstos durante la reconstrucción continuaron utilizando corriente y continuamente dicho paso, con el conocimiento de y sin objeción alguna por parte de los agentes y empleados de la codemandada

The Escambrón Development Co. que se encontraban a cargo de y trabajando en la reconstrucción del referido piso del Salón de las Naciones.

"6. Que mientras se realizaban las obras de reparaciones del piso del Salón de las Naciones, el codemandado Francisco Quiñones hizo construir tres enrejillados de madera cubriendo totalmente las tres arcadas que comunicaban dicho Salón de las Naciones con el salón comedor del Escambrón, con excepción de la tercera arcada que queda próxima a la cocina de dicho establecimiento, en la que se dejó un hueco en forma de puerta por el cual pasaban entre otras aquellas personas que tenían que dirigirse a los apartamientos subarrendados por dicho codemandado Francisco Quiñones que quedaban hacia el lado este del edificio principal, teniendo los inquilinos de dichos apartamientos y sus invitados que pasar por una esquina del Salón de las Naciones desde el hueco en la tercera arcada próxima a la cocina, hasta la puerta del Salón de las Naciones que daba acceso al paseo de concreto que conducía a dichos apartamientos.

"7. Que en, antes y después del día 2 de mayo de 1947, el codemandado Francisco Quiñones hizo colocar un tablón de aproximadamente doce (12) pulgadas de ancho, una y media (1½) pulgadas de espesor y de doce (12) a catorce (14) pies de largo, entre el triángulo o esquina formado por el hueco de puerta en la tercera arcada contigua a las cocinas y la puerta del Salón de las Naciones que daba acceso al paseo que conduce a los apartamientos, descansando dicho tablón en parte sobre los escombros y piedras irregulares de distintos tamaños que había en dicha esquina y que procedían de la reconstrucción del piso del Salón de las Naciones y que a través de dicho tablón pasaban usual y corrientemente los inquilinos e invitados de los mismos, que tenían arrendados dichos apartamientos, todo ello con el conocimiento de los agentes y empleados de The Escambrón Development Co. que estaban a cargo de y trabajando en la reconstrucción del piso del Salón de las Naciones, según antes se expresa en el párrafo 5 de estas conclusiones.

"8. Que dicho tablón carecía de sogas o pasamanos laterales de donde pudieran agarrarse los que lo usaban al pasar sobre él y se movía debido a lo irregular de los escombros sobre los cuales descansaba.

"9. Que ninguno de los demandados proveyeron y/o le facilitaron a los inquilinos, e invitados de éstos, que ocupaban dichos apartamientos otra forma de acceso seguro a los mismos, ni

colocaron avisos indicativos de peligro, así como tampoco hicieron iluminar adecuadamente el paso aquéllos, siendo la única iluminación la instalada en el salón comedor, la cual era muy pobre, y que tampoco ninguno de los demandados colocaron avisos visibles indicando que podía pasarse a los apartamientos por las cocinas, aunque existe evidencia de que algunas personas en algunas ocasiones utilizaron el paso por las cocinas para llegar a dichos apartamientos.

"  .    .    .    .    .    .    .    "

Las anteriores conclusiones tienen base en la prueba pasada, y en virtud de las mismas, como veremos al considerar el próximo error señalado, ni la arrendadora puede escapar a su responsabilidad legal ni el arrendatario a la suya. Desestimamos, pues, los apuntamientos de error que nos ocupan.

▆▆▆▆▆ El séptimo de los señalamientos de The Escambrón Development Company, Inc, y el primero de los demás apelantes, imputan error al tribunal a quo al imponerles responsabilidad por los daños sufridos por la demandante. Veamos, a la luz de los hechos probados, en qué consistió la negligencia de cada uno de los demandados y en virtud de qué relación jurídica han de responder a la demandante.

La responsabilidad de Francisco Quiñones—y con éste la de The Escambrón Beach Club Hotel Corporation y la de United States Casualty Co., hasta el límite del seguro—surge del hecho negligente de Francisco Quiñones de proporcionar a sus inquilinos, y a los invitados de éstos, un medio inadecuado y peligroso de llegar hasta los apartamientos que, como parte de la explotación de su negocio, subarrendaba. Quiñones venía obligado, en virtud de su relación jurídica con sus inquilinos—e independientemente de la obligación que para con él tuviera su arrendador de realizar las obras de reparación—a proporcionar a éstos un medio seguro y adecuado de llegar a sus habitaciones. Al proporcionar un medio inseguro y peligroso, incurrió—en el descargue de su obligación para con ellos—en la negligencia que el art. 1802 de nuestro Código Civil (ed. 1930) proclama como fuente del derecho a obtener reparación por daños.

La responsabilidad de la codemandada The Escambrón Development Company, Inc., surge de la conducta negligente que su actuación entraña, al permitir y tolerar, en la condición de peligrosidad creada por el estado del Salón de las Naciones—sin que proporcionara a su arrendatario otro medio adecuado de acceso a las habitaciones para que éste continuara la explotación de su negocio—que dicho arrendatario colocara en el lugar en que se llevaban a cabo las obras y que aquélla tenía bajo su control, el tablón que servía de puente para que sus inquilinos pasaran a sus habitaciones. Véase *A Passive Situation as a Proximate Cause*, 92 Cent. L. J. 390 et seq. Su obligación hacia dichos inquilinos no surge meramente de la relación de arrendadora y arrendatario y la consiguiente obligación que hacia Quiñones le imponía el art. 1444 del Código Civil, ed. 1930,(³) *Tesoro* v. *Abate*, 173 So. 196 (La. App. 1937) ; *Herbert* v. *Herrlitz*, 146 So. 65 (La. App. 1933) ; 16 Tulane L. Rev. 448. Tampoco se deriva de las prescripciones del art. 1807 de dicho cuerpo legal,(⁴) porque los daños no provinieron aquí por falta de las reparaciones necesarias de un edificio parcialmente en ruinas, sino en el curso de las mismas. Su obligación surge, bajo el art. 1802, de su deber—una vez que se tornó peligroso el trayecto a través del Salón de las Naciones y que ocupó el mismo—de proporcionar un medio seguro para que los inquilinos de Quiñones llegaran a sus habitaciones, siendo su pasividad y tolerancia, ante la peligrosidad del medio inseguro a que recurrió Quiñones para continuar la explotación del negocio a que

(³)"Artículo 1444.—El arrendador está obligado:

"(1) A entregar al arrendatario la cosa objeto de contrato.

"(2) A hacer en ella durante el arrendamiento todas las reparaciones necesarias a fin de conservarla en estado de servir para el uso a que ha sido destinada.

"(3) A mantener al arrendatario en el goce pacífico del arrendamiento por todo el tiempo del contrato.

"(4) A suscribir y entregar al arrendatario un recibo por cada pago hecho por éste."

(⁴)"Artículo 1807.—El propietario de un edificio es responsable de los daños que resulten de la ruina de todo o parte de él, si ésta sobreviniere por falta de las reparaciones necesarias."

dedicaba la arrendataria su propiedad, causa, coactiva con la de Quiñones, de los daños causados. *Cf. Pérez* v. *Gandía,* 32 D.P.R. 562, 564, y *Torres* v. *Fernández,* 56 D.P.R. 482. Véanse además, *Multiple Causation and Damage,* 47 Harv. L. Rev. 1127; *Concurrent Causation,* 83 U. S. of Pa. L. Rev. 941; *cf. Simonpietri* v. *Blanco,* 74 D.P.R. 533. Como reiteradamente hemos dicho, "cuando un daño es el resultado de la negligencia combinada de varias personas, éstas son responsables solidaria y mancomunadamente al perjudicado." *Cole* v. *Escambrón Development Co.,* 73 D.P.R. 520; *Rivera* v. *Great American Indemnity Co.,* 70 D.P.R. 825.

▆▆ A través de su séptimo señalamiento de error los apelantes Francisco Quiñones, Escambrón Beach Club Hotel Corporation y United States Casualty Co., sostienen que el tribunal inferior cometió error al dictar sentencia contra Escambrón Beach Club Hotel Corporation conjuntamente con Francisco Quiñones. Alegan que "no existiendo esta corporación a los momentos del accidente, no tiene responsabilidad alguna con respecto a la reclamación de la demandante y que la sentencia en su contra está indebidamente dictada."

No tienen razón. La demandante alegó en el párrafo número 2 de su demanda que "la referida corporación (Escambrón Beach Club Hotel Corp.) *se hizo cargo de todas las propiedades, derechos y obligaciones* de dicho demandado Francisco Quiñones." (Bastardillas nuestras.) En su contestación a la demanda estos apelantes expresamente aceptaron como cierta tal alegación. Así, pues, habiendo dicha corporación asumido en forma ilimitada "todas las propiedades, derechos y obligaciones" de su antecesor se hizo responsable de los daños que la negligencia de éste pudo ocasionar mientras explotaba el negocio. Véase 15 A.L.R. 1112, especialmente a la pág. 1188.

▆▆▆ El último señalamiento de error, común a todos los apelantes impugna la concesión de la suma de $4,000 por concepto de honorarios de abogado. The Escambrón Development Company, Inc., sostiene que el tribunal abusó de su

discreción al conceder una partida tan alta por tal concepto. Los demás apelantes sostienen que no se justifica tal suma por no existir temeridad de parte de ellos en la tramitación de esta acción.

Al fijar el montante de los honorarios de abogado el tribunal sentenciador debe tomar en consideración el trabajo necesariamente realizado por los abogados de la parte que obtiene sentencia a su favor, debiéndose considerar, con relación a este extremo, la naturaleza del litigio, las cuestiones envueltas, la duración del juicio y la cuantía en controversia. Véase *Sucn. Trías* v. *P. R. Leaf Tobacco Co.*, 59 D.P.R. 229.

Las dos partes apelantes negaron responsabilidad por los daños sufridos por la demandante. La condena al pago de honorarios de abogado es indicativa de que el tribunal sentenciador los consideró temerarios. *Font* v. *Pastrana*, 73 D.P.R. 247. Una vez determinada su temeridad, el tribunal venía obligado a la imposición de honorarios de abogado. Atendiendo a las circunstancias presentes en este caso, no creemos que la suma de $4,000 por tal concepto sea excesiva.

*La sentencia será confirmada.*